**In re PRIORITY FINISHING CORPORATION, Debtor.**

**Priority Finishing Corporation, Plaintiff,**

**v.**

**Multi–Route Freight Systems, Ltd., Defendant.**

**Bankruptcy No. 99–14572–JNF.**
**Adversary No. 99–1530.**

United States Bankruptcy Court, D. Massachusetts.

March 29, 2000.

---

Charles A. Lovell, Partridge, Snow & Hahn, Providence, RI, for plaintiff.

Douglas B. Rosner, Godston & Storrs, Boston, MA, for defendant.

**MEMORANDUM**

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is the Defendant's Motion to Dismiss the Debtor's complaint for failure to state a cause of action. *See* Fed.R.Civ.P. 12(b)(6), made applicable to this proceeding by Fed. R.Bankr.P. 7012. In determining the Motion to Dismiss, the Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The issue presented is whether in seeking turnover of property or the value of property from the Defendant, Multi–Route Freight Systems, Ltd. ("Multi–Route"), *see* 11 U.S.C. § 542(a), the Debtor has established that the Defendant had possession of property of the estate. *See* 11 U.S.C. § 541(a).

## II. THE DEBTOR'S COMPLAINT

In its complaint, the Debtor alleged that it sold approximately 32,978 yards of fabric (the "goods") with a value of $84,067.00 to Global Orbit Industries ("Global"), a Canadian firm, and Tiagi Tabah International Apparel Group, Inc. ("Tiagi"). It attached to its complaint two purchase order forms from Global identifying the Debtor as the vendor and "Global Orbit (LA)" as the entity to whom the goods were to be shipped at a Los Angeles, California location. The first purchase order contained an order date of March 20, 1998 and a delivery date of June 15, 1998. It provided "LA" in a box captioned "F.O.B. DESTINATION." The second purchase order contained an order date of June 2, 1998 and a delivery date of August 20, 1998. It did not contain a designated place in the box captioned "F.O.B. DESTINATION." The two purchase orders together were for 145,000 yards of fabric at a total cost of $397,244.17.

According to the Debtor in its complaint, on December 3, 1998, Multi–Route, a Canadian carrier, accepted the goods for shipment from the Debtor's Fall River location to Global and Tiagi. Multi–Route took possession of the goods and then refused to deliver them to Global or Tiagi because it was owed money by Global.[1] The Debtor attached a bill of lading, denominated a "STRAIGHT BILL OF LADING," to its complaint. The bill of lading identified Global as the consignor. As consignor, Global certified that the materials that were being shipped were "PROPERLY CLASSIFIED, DESCRIBED, PACKAGED, MARKED AND LABELED AND ARE IN PROPER CONDITION FOR TRANSPORTATION ACCORDING TO THE APPLICABLE REGULATIONS OF THE DEPARTMENT OF TRANSPORTATION." Global also certified the following in the bill of lading:

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading, the property described above in apparent good order, ... marked, consigned, and destined as indicated above which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination if on its route otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or any of said property, over all or any portion of said route to destination and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the bill of lading terms and conditions in the governing classification on the date of shipment.

Shipper hereby certifies that he is familiar with all the bill of lading terms and conditions in the governing classification and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Subject to section 7 of the conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:

The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

(emphasis supplied). Global was identified as the shipper in the upper right hand corner of the bill of lading and as consignee, at its Los Angeles, California address, in the upper left hand corner of the bill of lading. Multi–Route was identified as the carrier on the bill of lading following the pre-printed term "via." Two boxes, one

---

1. At the hearing held on February 16, 2000, the parties represented that Global was insolvent. They did not mention Tiagi. The only reference to Tiagi in the documents attached to the complaint was on the March 20, 1998 purchase order where the following hand written notation appears: Ref: Tiagi Tabah Invoice 61599.

captioned "COLLECT" and the other "PREPAID," also appear on the bill of lading. The box captioned "COLLECT" was checked. The Debtor did not sign the bill of lading. The bill of lading, however, contained its preprinted name and addresses followed by boxes. The Debtor's Massachusetts address was checked.

## III. DISCUSSION

■ The Debtor maintains that its complaint and the documents described above, as well as applicable law, demonstrate that the goods and their value were and are property of the estate. It argues that because one of the purchase orders provides for F.O.B. "LA," its contract with Global was a destination contract and that it retained title to the goods. Because Multi–Route did not deliver the goods to Global, as consignee, at its Los Angeles location, title to the goods remained with the Debtor as there was no tender there. The Debtor further argues that the bill of lading is ambiguous and cannot modify the F.O.B. term of the purchase order and that extrinsic evidence must be admitted to determine the rights of the parties.

■ The Court disagrees with the Debtor's interpretation of the documents and the law. The purchase orders were offers made to the Debtor, which were apparently accepted. Nevertheless, the offers do not embody all the material the terms of the contract between Global and the Debtor. Not only do the delivery dates on the purchase orders fail to conform with the actual date the goods left the Debtor's Fall River location, the quantity and dollar amounts of the orders fail to conform with the quantity and dollar amount of the contract described by the Debtor in its complaint. Accordingly, the purchase orders do not establish that the contract that existed between the Debtor and Global was a destination contract in view of the "strong presumption against the creation of destination contracts." Thus, "in the absence of the contract terms

or trade usage to the contrary, a contract which contemplates the transportation of goods from the seller to the buyer will be interpreted as a shipment contract and not a destination contract."[2] 67 Am.Jur.2d Sales, § 393 (1985). This is so because in a shipment contract, title, as well as the risk of loss, passes to the buyer when the seller delivers the goods to the carrier. Id. The Debtor's complaint does not contain any allegations that its contract with Global was intended to be a destination contract or that destination contracts were routinely used in its industry or routinely used by the Debtor and Global.

■ The bill of lading does not establish that the Debtor retained any property interest in the goods either.

A bill of lading is an instrument by which goods may be transferred from seller to buyer when a direct transfer is impossible and the goods must be shipped by a carrier. It describes the goods shipped, sets forth the identity of the shipper (or consignor) and the buyer (or consignee), and directs the carrier to deliver the freight to a certain location or person.... A nonnegotiable bill of lading, in which a consignee is specified, may be considered evidence of title, but the transfer of a nonnegotiable bill of lading does not, in and of itself, transfer title to the goods under the bill. White & Summers, *Uniform Commercial Code*, § 21–4 at 163 (1988).

\*　　\*　　\*　　\*　　\*　　\*

Bills of lading are thus contracts between shippers and carriers that spell out the carrier's obligation to deliver specific goods to specific people or places. *Interocean S.S. Corp. v. New Orleans Cold Storage & Warehouse Co.,* 865 F.2d 699, 703 (5th Cir.1989). As contracts of adhesion, they are strictly construed against the carrier. *Allied Chemical International Corp. v. Companhia de Navegacao Lloyd Brasileiro,* 775 F.2d 476, 482 (2d Cir.1985). *Met–Al Inc. v. Hansen Storage Co.,* 828 F.Supp. 1369, 1375–76 (E.D.Wis.1993). Al-

---

**2.** *See Droukas v. Divers Training Academy, Inc.,* 375 Mass. 149, 376 N.E.2d 548 (1978).

though the Debtor's name and address appears on the bill of lading, it did not sign the bill of lading and was neither consignor or shipper. The bill of lading attached to the complaint evidenced a contract between Multi–Route and Global, as Global was identified as both the shipper and the consignee of the goods with freight charges to be paid by the consignee upon delivery.[3] The bill of lading does not establish that the contract between the Debtor and Global was a destination contract, thus leaving title to the goods in the Debtor. On the contrary, it establishes that the Debtor delivered the goods to the carrier, Multi–Route, at its Massachusetts location, that Global, as buyer, shipper, consignor and consignee, made arrangements to have the goods shipped to Los Angeles at its expense, and that title to the goods passed to Global when possession was transferred to the carrier, Multi–Route.

The bill of lading is unambiguous, and the purchase orders do not create any ambiguity in the bill of lading. The bill of lading was a separate contract between Global and Multi–Route and does not evidence that the Debtor retained title to the goods. On the contrary, it evidences that the Debtor did not intend to retain title to the goods.

---

3. Thus, Global was responsible for the freight charges—a responsibility that would be consistent with a shipment contract, not a destination contract. *See Consolidated Freightways Corp. of Del. v. Pacheco Internat'l. Corp.*, 488 F.Supp. 68 (C.D.Cal.1979), in which the court stated the following:

> A shipper or consignor who tenders freight to a motor carrier operating in interstate commerce for transportation is the party primarily liable for freight charges, unless the shipper or consignor and the carrier contractually agree that the carrier will look to another party only for payment. *See, Louisville & Nashville R.R. Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 44 S.Ct. 441, 68 L.Ed. 900.
>
> The procedure by which a shipper or consignor may relieve himself of this primary obligation to pay the freight charges is to execute the "non-recourse" provisions of the Uniform Bill of Lading upon tendering the freight to the carrier. Where the shipper or consignor has failed to sign the

## IV. CONCLUSION

Upon consideration of the Debtor's complaint and the documents attached to the complaint, the Court finds that the Debtor's complaint fails to state a cause of action for turnover under § 542(a). Accordingly, the Court shall grant the Defendant's Motion to Dismiss.[4]

---

"non-recourse" provision contained in the carrier's Bill of Lading then, upon the failure of the consignee to pay for the freight charges, the shipper or consignor remains liable for the said freight charges. *See, e.g., Illinois Steel Co. v. Baltimore & O.R. Co.*, 320 U.S. 508, 64 S.Ct. 322, 88 L.Ed. 259 (1944). A direction by the consignor that the shipment be delivered "freight collect" is insufficient to relieve him of liability. *See, New York Central Rail Co. v. Frank H. Buck Co.*, 2 Cal.2d 384, 41 P.2d 547 (1935).

488 F.Supp. at 69–70.

4. In this regard, the Court notes that the Debtor filed the affidavit of Terry Bacon, the Debtor's Receivables Manager. He stated that the Debtor customarily prepared bills of lading. As the Global explained, however, this is not determinative of a contract between the Debtor and Multi–Route as the Debtor would be in the best position to identify the various boxes for shipment using its pre-printed form.